ATHERTON RICHARDS, TRUSTEE UNDER THE
WILL AND OF THE ESTATE OF BERNICE
PAUAHI BISHOP, DECEASED *v.* FRANK E.
MIDKIFF, EDWIN P. MURRAY, AND RICHARD
LYMAN, JR., TRUSTEES UNDER THE WILL
AND OF THE ESTATE OF BERNICE PAUAHI
BISHOP, DECEASED; HUALALAI DEVELOP-
MENT CORPORATION, A HAWAIIAN CORPO-
RATION, AND SHIRO KASHIWA, ATTORNEY
GENERAL OF THE STATE OF HAWAII.

No. 4298.

September 4, 1964.

Tsukiyama, C. J., Cassidy, Wirtz,
Lewis and Mizuha, JJ.

OPINION OF THE COURT BY WIRTZ, J.

This controversy concerns a suit brought by plaintiff-appellant, one of the Trustees of the Estate of Bernice Pauahi Bishop, against his fellow trustees,[1] Hualalai Development Corporation, an Hawaiian corporation, and the Attorney General of the State of Hawaii, to secure either annulment (cancellation) or reformation of a

---

[1] There are normally five trustees of this estate. However Willson C. Moore, one of the trustees who participated in the transaction involved, was not included in this action because he died before the filing of the amended complaint.

lease entered into between the Bishop Estate and Hualalai based upon a claim of breach of trust by the defendant trustees for having included in the lease a 15-acre parcel of land then under lease to plaintiff.

Plaintiff first brought an action for reformation of the lease on the ground of mistake. The chancellor granted motions to dismiss with leave to amend. Plaintiff thereupon filed an amended complaint containing detailed amplification of the original claims but asking for similar relief, namely, either annulment (cancellation) or reformation of the lease conceding, however, that there was no mistake in the execution of the lease but basing his claim for relief on an alleged breach of trust by his fellow trustees.

A motion to dismiss and for summary judgment, together with affidavits in support thereof, was filed by the defendant trustees. A motion for summary judgment, together with affidavits in support thereof, was filed by Hualalai. The Attorney General, against whom no relief was asked, apparently felt no necessity to plead. In response to the supporting affidavits a counter affidavit was filed by plaintiff.

The chancellor, after extensive briefing and argument, filed a decision on January 23, 1962, finding in effect (1) that the motion to dismiss should be granted for failure to state a claim upon which relief could be granted and (2) that the motions for summary judgment should be granted, inasmuch as there was no genuine issue as to any material fact in the case entitling the defendants to judgment as a matter of law. On January 25, 1962, the chancellor issued a judgment reciting the foregoing decision and granting both motions and ordering the amended complaint dismissed. From this judgment this appeal has been taken.

Preliminarily, the factual background of the con-

troversy is best summarized. Specific phases of the controversy will be detailed later herein as they appear necessary.

The Bernice P. Bishop Estate owns certain lands in the Kona District of the Island of Hawaii known as the lands of Kaupulehu. These lands as described in the lease in question comprise some 18,228 net acres and extend from the ocean up the southwest slope to the ridge of Mt. Hualalai and have an ocean frontage of approximately 15,000 feet.

In 1936 plaintiff, prior to becoming a trustee of the Bishop Estate leased from the estate for a period of 25 years a 15-acre parcel (covered by Bishop Estate Lease No. 5597) of the lands of Kaupulehu, being a portion of the three mile Kaupulehu shore frontage and all of the frontage of Kahuwai Bay.[2] This 15-acre parcel, which is the principal bone of contention in this controversy, was and is undeveloped; it has never had a source of potable water, road access or electricity. However, because of its location it was deemed necessary by Hualalai to consider the future development and use of the parcel in conjunction with the over-all development of the other lands of Kaupulehu as herein described.

Until 1952 the other lands of Kaupulehu had been leased to the John A. Maguire Estate and were operated as a cattle ranch known as "Huehue Ranch." The operations of this ranch, carried on in a haphazard manner, were not overly successful. Plaintiff, as a trustee of the Bishop Estate, came to the conclusion that these lands could be more profitably utilized if leased for a long term not only for the conduct of a cattle operation but also for the development of a resort area consisting of a number of mountain and beach sites for use by vacationers. He contacted one Randy Galt concerning the possibility of

---

2 See footnote 7, *infra.*

Galt's leasing the lands. Through Galt, defendant Hualalai's president became interested in the project.

The negotiations between plaintiff and Hualalai's president culminated in Hualalai's proposal by letter dated July 2, 1959, to lease the lands of Kaupulehu, a counteroffer by the trustees dated July 24, 1959, and Hualalai's acceptance of the trustees' counteroffer. The contract thus formed is the basis of the parties' rights and obligations pertaining to the lands of Kaupulehu and will be referred to herein as the 1959 agreement. This agreement for the leasing and development of "the entire land of Kaupulehu" was "subject to the rights of the lessee under Bishop Estate Lease No. 5597 expiring September 1, 1961 demising 15.00 acres at Kaupulehu Beach." The disputed 15-acre parcel is that covered by Bishop Estate Lease No. 5597.

No question was raised as to the right to have the disputed 15-acre parcel included in the lease until some 15 months later when late in October 1960 for the first time plaintiff allegedly stated to Hualalai's president that it was the position of the trustees that this 15-acre parcel was not included and would have to be handled separately. Thereupon Hualalai offered to lease this 15-acre parcel separately for a term to run concurrently with the lease contemplated in the 1959 agreement. After plaintiff advised his fellow trustees in November of 1960 that in his opinion the 15-acre parcel should not be included in the lease contemplated by the 1959 agreement, the defendant trustees decided to submit the question to counsel. It was the advice of counsel that the 15-acre parcel was clearly included but that the trustees might be able to seek reformation of the contract if there had been a mistake. Following receipt of this opinion the defendant trustees advised Hualalai that the contemplated lease under the 1959 agreement would include the 15-acre parcel.

When plaintiff questioned the validity of the opinion rendered by general counsel for the Bishop Estate, the defendant trustees submitted the question to independent counsel who also advised that the 15-acre parcel was included under the 1959 agreement.

Considerable delay ensued in the preparation and delivery of the lease while the trustees endeavored to secure changes in the 1959 agreement and plaintiff sought to exclude the 15-acre parcel. On February 8, 1961, counsel for Hualalai addressed a demand to the trustees to issue the lease in accordance with their contract including the 15-acre parcel. After further negotiations, resulting in certain concessions by Hualalai in order to secure the lease without litigation, the lease including the 15-acre parcel was finally executed on April 14, 1961.

This appeal is concerned with the single specification of error that the chancellor erred in dismissing the amended complaint. The appellant initially contends in his opening brief that the judgment appealed from "is a judgment entered on the motion to dismiss" and "not a judgment entered on the motions for summary judgment." Placing his reliance on *Gonsalves* v. *Gilbert*, 44 Haw. 543, 550, 356 P.2d 379, 381, he asks this court upon appeal to disregard the affidavits on file. At the oral argument he assumed that it was both, a judgment on the motion to dismiss and a judgment on a motion for summary judgment.

In the present case it appears that the chancellor in his decision[3] took the position that an order should be entered granting the motion to dismiss and then specifically considered the motions for summary judgment. He found that "there is no genuine material issue of fact in

---

[3] There can be no question as to this court's right to examine the decision in interpreting the judgment. *Waterhouse* v. *Capital Investment Co.*, 44 Haw. 235, 238, 353 P.2d 1007, 1011.

this case" and held that an order would be entered granting the motions for summary judgment. Since under H.R.C.P., Rule 52(a) "findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56," it was not required that he state his reliance on the affidavits. See 5 Moore, *Federal Practice*, § 52.08 (2d ed.) ; 3 Barron & Holtzoff, *Federal Practice and Procedure*, § 1242. However, his finding of no genuine issue of material fact clearly indicates such reliance.

The judgment entered by the chancellor reads as follows:

> "The above entitled cause having come on for hearing upon defendants' motions to dismiss and for summary judgment, and the Court being fully advised in the premises and having rendered its decision on January 23, 1962 granting said motions, NOW THEREFORE
>
> "IT IS ADJUDGED that plaintiff take nothing by his action and that the amended complaint be and the same is hereby dismissed."[4]

By its language the judgment for defendants was not only on the motion to dismiss but also on the motions for summary judgment.

In actuality the motion to dismiss had been converted into a motion for summary judgment since "matters outside the pleadings [were] presented to and not excluded by the court." H.R.C.P., Rule 12(b). *Mantin* v. *Broadcast Music, Inc.*, 248 F.2d 530 (9th Cir. 1957) ; *Suckow Borax Mines Consol.* v. *Borax Consolidated*, 185 F.2d 196 (9th Cir. 1950). Consequently, there can be no question that the judgment on appeal is a summary judgment on the merits. Unlike *Gonsalves, supra*, it is clear from the record that the chancellor had ruled on the motions for summary

---

[4] The language that "plaintiff take nothing by his action" is the traditional language for an adjudication on the merits.

judgment and further considered "matters outside the pleadings."[5]

Summary judgment should be granted to the moving party where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. H.R.C.P., Rule 56(b) (c); *Brown* v. *Bishop Trust Co.*, 44 Haw. 385, 388, 355 P.2d 179, 181; *Territory* v. *Arneson*, 44 Haw. 343, 351, 354 P.2d 981, 986; 6 Moore, *Federal Practice*, § 56.27; 3 Barron & Holtzoff, *Federal Practice and Procedure*, § 1234. It should be remembered that under a motion for summary judgment the question to be decided is simply whether there is a genuine issue as to any material fact and not how that issue should be determined. The affidavits accompanying such a motion are considered for the limited purpose of ascertaining whether an issue of fact is presented and cannot be used as a basis for deciding the fact issue. *Frederic Hart & Co.* v. *Recordgraph Corp.*, 169 F.2d 580 (3d Cir. 1948); 6 Moore, *Federal Practice*, § 56.04; also see *Kam Koon Wan* v. *Black, Ltd.*, 75 F. Supp. 553 (D.C. Haw.). To create a "genuine issue as to any material fact" a question of fact presented under a conflict in the affidavits as to a particular matter must be of such a nature that it would affect the result. *Lewis* v. *Atlas Corp.*, 63 F. Supp. 217, *aff'd*, 158 F.2d 599 (3d Cir. 1946).

In reviewing an appeal from a summary judgment the question before this court is whether the amended complaint, affidavits and exhibits on file raise any genuine

---

[5] In *Gonsalves, supra*, this court merely held that where it was clear from the record that the trial court had not considered "matters outside the pleadings," only the motion to dismiss for "failure to state a claim upon which relief can be granted" had been considered. Since the trial court had not ruled on the motion for summary judgment, the appellate court could not consider any of the affidavits on file in its review of the correctness of the motion filed under H.R.C.P., Rule 12(b). Concluding that plaintiff's complaint stated a claim for relief, this court reversed the order of dismissal.

issue of material fact. *Brown* v. *Bishop Trust Co., supra,*
44 Haw. 385, 388, 355 P.2d 179, 181; 6 Moore, *Federal
Practice,* § 56.27(1). And where the affidavits show no
genuine issue as to any material fact the pleadings cannot
supply one. 6 Moore, *Federal Practice,* § 56.11(3); 3
Barron & Holtzoff, *Federal Practice and Procedure,*
§ 1235.1.

The amended complaint alleges that plaintiff's fellow
trustees committed a breach of trust in executing the
lease in question and seeks to have the lease annulled or
in the alternative reformed. No relief is asked against his
fellow trustees as a consequence of this alleged breach of
trust. The salient points of the amended complaint are
(1) breach of trust and (2) notice of such breach to the
lessee, defendant Hualalai.

Preliminarily, it would be well to consider the chal-
lenge made to the standing of plaintiff to institute these
proceedings. In short it is contended that "plaintiff is not
a party to the lease. He alone has no equitable right
to bring suit to reform it or to sue on behalf of the trust
estate."

Plaintiff is only one of five trustees of the Bishop
Estate.[6] The administration of charitable trusts is gov-
erned by majority rule. When a majority of the trustees
act it is the act of all as "a collective trustee." *Cf., Moss-
man* v. *Damon,* 15 Haw. 401, 404. This is expressly pro-
vided in Mrs. Bishop's will:

> "I direct that a majority of my said trustees may
> act in all cases, and may convey real estate, and per-
> form all of the duties and powers hereby conferred;
> but three of them at least must join in all acts."
> (*Damon* v. *Hyde,* 11 Haw. 153, 154.)

The rule of trust law that multiple trustees can only act

---

[6] See footnote 1, *ante.*

as a unit is settled. Restatement (Second), *Trusts,*
§§ 194, 383 (1959) ; 2 Scott, *Trusts,* § 194 (2d ed. 1956),
and see also 4 Scott, *Trusts,* § 383 (2d ed. 1956) ; Bogert,
*Trusts and Trustees,* § 391 (2d ed.) ; 54 Am. Jur., *Trusts,*
§ 296; 90 C.J.S., *Trusts,* § 258.

The application of this rule is limited to situations
where the trustee is attempting to exercise the powers
conferred upon him. The law with respect to the exercise
of the powers of trustees of charitable trusts is no differ-
ent from that governing private trustees. Bogert, *Trusts
and Trustees,* § 391 (2d ed.). The determination of
whether the trust estate should maintain a legal action
requires the requisite concurrence of the trustees just as
the exercise of any other power. 1 Perry, *Trusts and
Trustees,* § 411 (7th ed.) ; 90 C.J.S., *Trusts,* § 367. This
latter principle is well expressed in *Jones* v. *Incorporated
Village of Lloyd Harbor,* 277 App. Div. 1124, 100 N.Y.S.2d
948, *aff'd,* 302 N.Y. 718, 98 N.E. 2d 589, involving an action
by one trustee of a private trust on behalf of the trust for
a declaratory judgment, in the following language:

> "However, the question of whether the action is in
> the best interests of the trust estate on behalf of which
> she also sues here, as a co-trustee, and whether the
> action should be maintained in behalf of the estate, ap-
> parently is one which calls for the exercise of dis-
> cretion of the trustees. Accordingly, neither trustee
> may maintain the action alone * * *." 100 N.Y.S.2d
> at 949.

See to the same effect *Kramme* v. *Mewshaw,* 147 Md. 535,
128 Atl. 468; *Donovan* v. *Miller,* 137 Md. 555, 112 Atl.
926; *McGeorge* v. *Bigstone Gap Imp. Co.,* 88 Fed. 599
(C.C. W.D. Va. 1898).

As seen, the relief sought by plaintiff in this action
is annulment (cancellation) or in the alternative ref-
ormation of the lease to Hualalai. Under the law of trusts

the trustees are a collective party to the lease and one trustee has no standing to maintain an action on behalf of the trust estate as he alone cannot act in such representative capacity. Reformation may be had only by a party to an instrument or those in privity with him. 76 C.J.S., *Reformation of Instruments,* § 47; 45 Am. Jur., *Reformation of Instruments,* § 64. Furthermore, the determination of whether the maintenance of such an action to reform this lease is in the best interests of the trust estate would require the exercise of the collective trustees' discretion. Consequently, the plaintiff alone has no standing to maintain an action for reformation of this lease brought on behalf of the Bishop Estate.

However, there is another principle of trust law which permits one trustee to bring an action against his co-trustee to compel the latter to perform his duties under the trust or to enjoin him from committing a breach of trust or to compel him to redress a breach of trust. Restatement (Second), *Trusts,* § 200, comment *e* (1959); 2 Scott, *Trusts,* § 200.2 (2d ed. 1956). This results from the duty owed to the beneficiary by a trustee "to prevent a co-trustee from committing a breach of trust or to compel a co-trustee to redress a breach of trust." Restatement (Second), *Trusts,* § 184 (1959); and see 2 Scott, *Trusts,* § 184 (2d ed. 1956). Failure to do so could render the trustee himself also guilty of breach of trust. 2 Scott, *Trusts,* § 224.5 (2d ed. 1956). Consequently, a trustee suing his fellow trustees to redress a breach of trust is in effect bringing a derivative action on behalf of the beneficiaries of the trust. Restatement (Second), *Trusts,* § 200 (1959).

The rule is no different for charitable trusts as illustrated in Professor Scott's treatise:

"It is frequently said in the cases that the Attorney General alone has power to maintain suits for the

enforcement of charitable trusts. This, however, is not strictly true. It is clear, for example, that where there are several trustees, one of them may maintain an action against the others to enforce the trust or to compel the redress of a breach of trust."

4 Scott, *Trusts*, § 391 (2d ed. 1956) at page 2757; Restatement (Second), *Trusts*, § 391, comment *b* (1959); also see *Eastman* v. *Allard*, 149 Mass. 154, 21 N.E. 235.

Inasmuch as plaintiff seeks by his amended complaint to have the lease executed by his fellow trustees annulled (cancelled) for breach of trust, he would have standing as acting on behalf of the beneficiaries of the Bishop Estate rather than on behalf of the Bishop Estate itself to redress an alleged breach of trust. However, to obtain the relief sought it must be shown that the lessee took with notice of the breach of trust as alleged in the amended complaint. Restitution of the property conveyed in breach of trust or restoration of the *status quo* through cancellation is a proper remedy where the transferee has notice of the breach of trust. Restatement (Second), *Trusts*, § 291 (1959); 2 Scott, *Trusts*, § 189.1 (2d ed. 1956); *Morville* v. *Fowle*, 144 Mass. 109, 10 N.E. 766; *Wilmington Trust Co.* v. *Carrow*, 14 Del. Ch. 290, 125 Atl. 350; *Allen* v. *Hussey*, 101 Cal. App. 2d 457, 225 P.2d 674.

Since plaintiff has standing to institute these proceedings only on the basis that his fellow trustees committed a breach of trust in entering into this lease, he cannot prevail under the motions for summary judgment if the movants satisfy the court that there is no genuine issue of fact as to whether such breach of trust was committed and Hualalai had notice of same. In opposing the motions, plaintiff must present the facts in proper form.

"* * * conclusions of law will not suffice; and the opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, nor

merely suspicions." 6 Moore, *Federal Practice,* § 56.15(3) at page 2131 (2d ed. 1953).

"* * * Summary judgment should be rendered, even though an issue may be raised formally by the pleadings, where the supporting affidavits, and the opposing affidavits, if any, show that there is no genuine issue of material fact." 6 Moore, *Federal Practice,* § 56.11(3) at page 2069 (2d ed. 1953).

The amended complaint alleged four acts as constituting a breach of trust: (a) informing Hualalai that the 15-acre parcel was included in the contract to lease; (b) failing to take any steps to obtain a judicial interpretation of the contract to lease (the contract resulting from the acceptance of the July 24, 1959 counteroffer of the trustees); (c) including the 15-acre parcel in the lease without requiring Hualalai to submit detailed development plans; and (d) failing to reserve a reasonable rental for the 15-acre parcel.

Basically these alleged four acts constituting breaches of trust can be resolved into two broad categories:

(1) The trustees' alleged breach of trust in failing to seek a judicial interpretation of their offer to lease, and

(2) The trustees' alleged breach of trust in executing this lease.

From the amended complaint and the affidavits and exhibits on file emerges a picture of the events and circumstances surrounding the negotiation and execution of the lease which brings into proper focus the question of fiduciary conduct. None of the allegations of the amended complaint, averments in the affidavits or statements made in the exhibits upon which the following account was based were controverted, except qualifiedly in the single instance noted.

When the prior lease of the lands of Kaupulehu[7] expired in 1952, plaintiff suggested that this land could be put to better use if the beach area was developed along with some mountain cabin sites. On April 27, 1959, he prepared a development plan which advocated the development of the entire land of Kaupulehu into three categories: (1) the major portion being an area devoted to cattle ranching; (2) the mauka area for the development of resort mountain cabins, and (3) the makai area along the three miles of shore frontage for the development of resort beach homes. There was no mention or reference made in the development plan to any exclusion of the 15-acre parcel which was then under lease to him.

About this time Mr. Garner Anthony, later president of Hualalai, became interested and under date of July 2, 1959 addressed a letter to the Bishop Estate informing the trustees that a corporation to be named Hualalai Development Corporation was being formed and offered on behalf of the new corporation to lease the lands of Kaupulehu "comprising approximately 15,570 acres on the following terms and conditions:

"1. The Estate will grant the lessee a 75-year lease. It is understood that upon the expiration of the lease to Mr. Atherton Richards, that area under lease to Mr.

Richards shall become part of the proposed leasehold." The offer continued in detail proposing to develop the mountain cabin sites and beach homes as advocated in the development plan. The rental provisions offered were similar to those suggested in the development plan.

On July 7, 1959, plaintiff and another trustee, Richard

---

[7] The Bishop Estate had in 1932 leased some 18,922.02 acres of land located in the Ahupuaa of Kaupulehu to the John A. Maguire Estate, Limited, for the term of 20 years. The entire area was operated as a cattle ranch. The disputed 15-acre parcel of land had been surrendered by the Maguire Estate to permit the Bishop Estate to lease the same to the plaintiff on September 1, 1936 under Lease No. 5597.

Lyman, Jr., were constituted a negotiating committee to work out the details of the lease with Hualalai. On July 9, 1959, plaintiff submitted a memorandum to his fellow trustees suggesting revisions of the July 2nd proposal made on behalf of Hualalai. In this memorandum no mention was made of any exclusion of the 15-acre parcel although the proposal plainly stated that "upon the expiration of the lease to Mr. Atherton Richards, that area under lease to Mr. Richards shall become part of the proposed leasehold." The only suggestion with reference to paragraph numbered one of the July 2nd proposal was that the term of the lease should be for 65 years rather than the proposed 75 years.

On July 24, 1959, the Bishop Estate submitted a counteroffer prepared by plaintiff and a staff employee, Mr. Dow, which was signed on behalf of the estate by plaintiff and his fellow trustees Moore and Midkiff. It stated in part:

"Lease Terms and Conditions.

"1. Area—approximately 15,570 acres comprising the *entire land of Kaupulehu* as owned by Bishop Estate, exclusive of the Mauka Forest Reserve lease to the Board of Agriculture and Forestry, and *subject to* or excluding the following:

"(a) *Subject to* the rights of the lessee under Bishop Estate Lease No. 5597 expiring September 1, 1961, demising 15.00 acres at Kaupulehu Beach;

"(b) Subject to pending Forest Surrender Agreement with the Board of Agriculture & Forestry comprising 5.787 acres adjoining the mauka side of government road;

"(c) Subject to pending conveyance of reflector station site ($\pm$ 40,000 sq. ft.) and repeater station site ($\pm$ 10,000 sq. ft.) plus perpetual

easements for roadways and power lines to Hawaiian Telephone Co.;

"(d) Subject to the rights of the lessee under Bishop Estate Lease No. 2446—Holualoa-Puuwaawaa Pipe Line across Kaupulehu expiring March 28, 1963." (Emphasis added.)

The rental provisions in this counteroffer were similar to those originally proposed by Hualalai and as set forth in the development plan. It required Hualalai to do some exploratory drilling for water as a condition precedent to the issuance of a lease.

This counteroffer was accepted by Hualalai on August 13, 1959. On or about August 25, 1960, Hualalai had completed the required exploratory drilling and became entitled to the issuance of a lease. On September 19, 1960, the Bishop Estate notified Hualalai by letter that the staff had been instructed to proceed immediately with the issuance of a lease pursuant to the 1959 agreement. This letter contained no intimation that the disputed 15-acre parcel was to be excluded.

Because of its location along the beach at Kahuwai Bay, the 15-acre parcel then under lease to plaintiff, was deemed necessary to the development of the resort potential of the lands in accordance with the development plan. This 15-acre parcel had no source of potable water, road access or electricity so that it could not, as a practical matter, be developed apart from the other lands of Kaupulehu. Further, the 1959 agreement required Hualalai to develop a boat harbor in Kahuwai Bay, the frontage of which bay is included within the 15-acre parcel.

During the negotiations preceding the 1959 agreement, Anthony had discussed with plaintiff the problem created by the fact that plaintiff's lease on the 15-acre parcel would not expire until a year after the commencement of Hualalai's lease. At that time plaintiff had assured

Anthony, as well as the secretary of Hualalai, that whenever Hualalai was ready to commence development of the Kahuwai Bay area he would assign the remainder of this term to Hualalai in exchange for a lot on the beach at no rental for a certain period of time to be agreed upon.[8]

It was not until late October 1960, some 15 months after the 1959 agreement, that plaintiff indicated to anyone that the 15-acre parcel was not included in the agreement.

Plaintiff's sudden, although delayed, contention that "his" 15-acre parcel was not contained in the 1959 agreement may be explained by the negotiations carried on by him on his own behalf, as well as on behalf of Kahua Ranch, in which he has the controlling interest, with Hualalai during the negotiations conducted by him on behalf of the Bishop Estate before and after the 1959 agreement and until such personal negotiations fell through some time before October of 1960. Plaintiff was interested in subleasing the major area of the lands of Kaupulehu earmarked for ranching operations for Kahua Ranch. It was averred that plaintiff "expressed concern over his position as Trustee and stated that perhaps an independent or subsidiary corporation would have to be set up to take over the ranching operation, in effect to act as a dummy for Kahua." After several proposals and counterproposals the negotiations were dropped as plaintiff's terms were deemed unreasonable and unacceptable to Hualalai.

Plaintiff makes much of the fact that Hualalai, by

---

[8] Although plaintiff denies telling the secretary of Hualalai that the 15-acre parcel would revert to Hualalai upon the expiration of plaintiff's lease, he does not deny the secretary's assertion that plaintiff told him that he would assign his lease to Hualalai in exchange for a lot on the beach with free rental when Hualalai was ready to commence development. It is to be noted that under the 1959 agreement the Bishop Estate had a fifty per cent. interest in the net sublease rentals after recovery of the lessee's capital outlay.

letter of November 3, 1960, offered to lease the disputed 15-acre parcel separately at an additional rental. This offer was inferentially withdrawn by Hualalai's letter of November 23, 1960 which demanded that the lease be issued "in accordance with the terms of the Trustees' Offer," and on February 8, 1961, Hualalai's counsel specifically demanded inclusion of the 15-acre parcel in the lease.

The reasons for Hualalai's offer of November 3, 1960, and the confusion of the trustees, other than plaintiff, with respect to that offer, are explained by the following series of events:

Upon qualifying for the lease on or about August 25, 1960, Hualalai entered into negotiations with one J. M. Jackson with a view towards subleasing a part of the demised premises, including the 15-acre parcel, for development as a resort area. Jackson was only interested in the sublease if arrangements could be made with plaintiff for an immediate assignment of his unexpired term on the 15-acre parcel.

This requirement caused Anthony to contact plaintiff in October of 1960 and to request his promised assignment of the remaining term on the 15-acre parcel. Plaintiff refused saying he had assigned the remainder of his term to his nephew with whom Anthony would have to deal. He also advised Anthony that his nephew was applying for a renewal of the 15-acre lease. The nephew thereafter turned down Anthony's offer of November 1, 1960 to purchase the remaining term of the 15-acre parcel, stating that he wanted 15 to 20 years' free rental on a substitute parcel instead of the 10 years' free rent offer. He further advised Anthony that he was not going to conclude any negotiations concerning the 15-acre parcel until he had been advised as to the disposition of his request for an extension of his lease. On another occasion

the nephew told Anthony that everything had to be cleared by his uncle, the plaintiff.

This state of affairs, coupled with the fact that the other trustees had never confirmed to him that they would abide by the 1959 agreement and the assumption that plaintiff spoke for the other trustees, led Anthony to the conclusion that any insistence upon his legal rights would cause a delay which would jeopardize his opportunity for subleasing to Jackson. Accordingly, he decided without the advice of counsel that his best course of action was to make a separate offer for the 15-acre parcel. This he did at the trustees' meeting of November 3, 1960.

The trustees concluded at their meeting of November 10, 1960, that they were not free to deal with anyone until they had concluded a study of the potentialities of the area. This was inconsistent with their offer of July 24, 1959. The confusion on the part of the other trustees was due to their misplaced confidence in their principal negotiator, the plaintiff, who misled them as to the inclusion of the 15-acre parcel as disclosed by the following discourse from the transcript of the trustees' meeting of November 3, 1960:

"Mr. Dow [of the Bishop Estate staff] : Mr. Richards asked last week . . . matter of request by H. M. Richards, Jr. for a renewal of lease (No. 5597) at Kaupulehu . . .

Mr. Richards: Probably what Anthony is coming in about. That's why I assigned it. So I wouldn't be in an embarrassing position . . . It is going to be quite interesting. Good beach . . . koa on one side. On the other side, what has happened to Kona. This is going to be a very interesting approach. Young Anthony is trying to rush this thing up and make a deal. It was excluded from the Anthony proposal because there was an existing lease on it . . .

Mr. Midkiff: Was there something in our negotiations with Anthony that referred to the possibility of his using this land.

Mr. Richards: No. There is a very positive exclusion on it. It was under lease. In the document itself there is an exclusion of the leased area.

Mr. Midkiff: And no intention to make that available to him.

Mr. Dow: I think perhaps he felt that would be made available to him. His corporation is putting in the money to provide access and water. No commitment in the document."

Mr. Richards again repeated his contention that Hualalai's "agreement with the Bishop Estate specifically excludes this property."

On November 17, 1960, the trustees received the staff report requested at the prior meeting of November 10, 1960, recommending that they refrain from committing the use of the 15-acre parcel for the time being. They then voted to deny extension of the existing lease to plaintiff's nephew inasmuch as they did not want to enter into a long term commitment until such time as their study of the future development potential of the property was completed.

On December 12, 1960, the trustees received a staff report stating that although the 1959 agreement did not call for a detailed development plan, Hualalai should be required to submit such plan in order to justify its request to lease the 15-acre parcel.

Thereafter, the other trustees upon familiarizing themselves with the matter came to the realization that the 15-acre parcel was probably included in the terms of their offer of July 24, 1959, but because of the continued insistence of plaintiff that the 15-acre parcel was not included,

they finally decided in their December 15, 1960 meeting to submit the whole matter to their counsel for an opinion.

On December 27, 1960, their counsel advised the trustees that in his opinion the language in the July 24, 1959 agreement was clear and unambiguous and included the 15-acre parcel; that its acceptance by Hualalai constituted a contract to lease; that if it could be proved that the 15-acre parcel was included by mistake then probably the contract could be reformed although he doubted that the trustees would prevail. He recommended adherence to the written terms of the contract.

On December 29, 1960, all of the trustees except plaintiff voted to adopt the recommendation of counsel and to advise Hualalai that the 15-acre parcel was contained in their offer of July 24, 1959.

On February 1, 1961, plaintiff informed his fellow trustees that he considered the inclusion of the 15-acre parcel in Hualalai's lease would constitute a breach of trust and he would be forced to institute legal proceedings. He was also critical of the advice from counsel because of counsel's relationship with the president of Hualalai. Thereupon the other trustees decided to refer the matter to special counsel for an opinion.

On February 24, 1961, special counsel submitted to the trustees his opinion that the 15-acre parcel must definitely be considered part of the area covered by the offer of July 24, 1959, upon the termination of the existing lease, and that the holder of such lease would not have any legal or equitable right to a renewal or extension of the same.

On March 2, 1961, counsel for the trustees submitted a draft of the proposed lease to Hualalai, which included the 15-acre parcel subject to the rights of the existing lessee. On March 30, 1961, plaintiff gave written notice to

Hualalai that any lease of the land including the 15-acre parcel without reserving a fair rent in addition to that stated in the 1959 agreement would be void as constituting a breach of trust. On April 14, 1961, the trustees, other than plaintiff, executed the lease which included the 15-acre parcel and delivered the same to Hualalai.

In essence the breach of trust claimed was execution of the lease without taking action to obtain a judicial interpretation of the contract. This involved the exercise of judgment on the part of the defendant trustees in the administration of the trust and was a matter lying within the discretion of the trustees.

Trustees are under a duty to the beneficiaries to take all reasonable steps to realize claims held in trust. However, they have no duty to bring an action to enforce a claim pertaining to the trust property if it appears unreasonable to do so either because the action might be unsuccessful or would involve an expense disproportionate to the possibility of success. Restatement (Second), *Trusts,* § 177, comment *c.* The best interests of the trust estate is the criteria in all cases.

The agreement of July 24, 1959, between the trustees and Hualalai contained all of the basic elements of a contract. It was plain, unambiguous and specifically enforceable. See *Francone* v. *McClay,* 41 Haw. 72. This contract to lease was expressly subject to certain outstanding leases and exclusive of other parcels of land. As to the disputed 15-acre parcel it was "subject to the rights of the lessee under Bishop Estate Lease No. 5597 expiring September 1, 1961, demising 15 acres at Kaupulehu Beach." This language is clear, unambiguous and obviously was intended to include the 15-acre parcel in the contract to lease, subject only to the existing tenure of plaintiff.

Appellant contends "the language of the 1959 agree-

ment was not unambiguous. 'Subject to the rights of the lessee under Bishop Estate Lease No. 5597' might well have meant the right of the lessee in possession to prior consideration for renewal." A lessee of an expiring lease has no right to any prior consideration for a renewal of his lease unless such is expressly provided for in the lease. As a matter of policy the Bishop Estate does offer an extension of the expired lease in cases where the lessee has improved the premises. They do not offer an extension where the lessee has made no improvements or where there has been a change of use, as was the situation here. The only right of the lessee under Bishop Estate Lease No. 5597 was to have the use and possession of the 15-acre parcel until his lease expired on September 1, 1961. There was no ambiguity in the language of the contract and it stands free from contradiction, alteration or variance by parol evidence. *Trustees Bishop Estate* v. *Castle & Cooke,* 45 Haw. 409, 368 P.2d 887. The advice of counsel sought by the trustees was to this effect and further that the agreement to lease constituted an enforceable contract in the absence of mutual mistake.

It is well established that trustees may rely on the opinion of reputable counsel in determining the possibility of success in legal proceedings in order to arrive at a judgment whether or not to pursue such a course of action. See *In re United Conclave Building & Loan Ass'n,* 135 N.J. Eq. 63, 37 A.2d 197; *Austin's Estate,* 44 D. & C. 249 (Pa. 1942); *Beam* v. *Paterson Safe Deposit & Trust Co.,* 83 N.J. Eq. 628, 92 Atl. 351; *Mills* v. *Bluestein,* 275 N.Y. 317, 9 N.E.2d 944; *Van Der Veer* v. *Ames,* 6 N.J. Super. 143, 70 A.2d 517; *Miller* v. *Proctor,* 20 Ohio 442; *Bradley's Appeal,* 89 Pa. 514; *In re Wanamaker's Trust,* 340 Pa. 419, 17 A.2d 380; *In re Demmerle's Exr.,* 130 Misc. Rep. 684, 225 N.Y. Supp. 190; 2 Scott, *Trusts,* § 201 (2d ed. 1956). To seek and follow the advice of

competent counsel is certainly indicatory of prudence in the exercise of discretion. As stated in *In re United Conclave Building & Loan Ass'n, supra,* 135 N.J. Eq. 63, 37 A.2d 197, 198-9:

"We may generalize and say that a trustee can safely rely on counsel upon legal questions which arise in the management of the estate when the ordinarily diligent and careful man would do the like in respect to his own property."

Appellant contends that trustees are not excused from breach of trust by reason of the advice of counsel, citing dicta from *Estate of Allen,* 35 Haw. 501, 527. Apart from the fact that no question of breach of trust was involved in *Allen,* the trustees did not there claim any "protection or immunity" from following the erroneous advice of counsel. The court in *Allen* was talking about the powers of the trustee to retain a stock dividend as part of the corpus of the trust. Here, however, it cannot be said that the advice of counsel was in conflict with the prescribed powers and duties of the trustees. Rather, the advice here given by counsel related to a legal question in the field of reformation of instruments which arose in connection with the management of the estate. See 2 Scott, *Trusts,* § 201 at page 1509 (2d ed. 1956); Restatement (Second), *Trusts,* § 201, comment *c.* The other cases relied on by appellant also relate to counsel's advice concerning the existence of a power conferred by the trust instruments to do a certain act. See *Freeman* v. *Cook,* 41 N.C. 373; *In re Borden's Trust,* 358 Pa. 138, 56 A.2d 108, and *Allen* v. *Hussey, supra,* 101 Cal. App. 2d 457, 225 P.2d 674.

As pointed out by the court in *Jones* v. *Incorporated Village of Lloyd Harbor, supra,* 277 App. Div. 1124, 100 N.Y.S. 2d 948, the question whether an action "should be maintained in behalf of the estate apparently is one which calls for the exercise of discretion of the trustees."

The determination of the trustees not to bring suit against Hualalai to reform the lease is not subject to review in the absence of a showing of an abuse of discretion. *Cf., Estate of James Campbell,* 42 Haw. 586. Further, the trustees did not have a well founded doubt as to the inclusion of the 15-acre parcel, which would be required for a bill of instructions. *Estate of Campbell,* 38 Haw. 573, 581-582. Here, the defendant trustees had the power and duty to determine the estate's position on whether the offer to lease stated their intentions and whether suit should be brought to attempt reformation.

The record in this case reveals at most a claim of doubtful validity which was thoroughly reviewed by the trustees, their regular counsel and special counsel. None of the defendant trustees ever intended, despite their momentary confusion when misled by the acts of plaintiff, that the 15-acre parcel was to be excluded from the demised premises. In good faith they determined that no action for reformation should be brought and no abuse of discretion has been shown. The trustees simply chose not to pursue a frivolous claim.

The execution of the lease by the defendant trustees on behalf of the Bishop Estate on April 14, 1961, with full knowledge of plaintiff's claim of alleged "mistake," had the effect of finalizing the terms of the agreement between the parties thereto. Such terms are found not in the contract to lease, or in the subsequent negotiations, but rather in the lease itself. 9 Wigmore, *Evidence,* § 2425 (3d ed.) ; see also *Henry* v. *Shields,* 19 Haw. 302; *Richards* v. *Ontai,* 19 Haw. 451; *Macfie* v. *Hackfeld,* 6 Haw. 558; 17A C.J.S., *Contracts,* § 322. This operation of the parol evidence rule would effectively bar an action for reformation or rescission of the lease by the trustees as they executed the lease with knowledge of the fact which might have given rise to a claim for reformation or rescission. 76 C.J.S., *Ref-*

*ormation of Instruments,* § 31; 45 Am. Jur., *Reformation of Instruments,* § 75; 3 Black, *Rescission and Cancellation,* § 592 (2d ed.); Restatement, *Restitution,* § 68(3); *McMillon* v. *Tower of Flagstaff,* 18 Ariz. 536, 164 Pac. 318; *Knight* v. *Electric Household Utilities Corp.,* 133 N.J. Eq. 87, 30 A.2d 585.

As seen above, plaintiff has standing to bring this proceeding not on behalf of the estate for reformation or rescission but in a representative capacity on behalf of the beneficiaries to restore the *status quo* because of a breach of trust. Any question as to whether the rental provision in this lease is so grossly inadequate as to constitute an abuse of discretion must be determined from a review of the terms of the lease.

Plaintiff contends that he need not question the reasonableness of the rental provision contained in the lease but may question the reasonableness only of the return for the 15-acre parcel. No cases have been cited in support of this contention. *Griffen* v. *Ford,* 1 Bosw. 123 (N.Y. Sup. Ct. 1857) and *Wilmington Trust Co.* v. *Carrow, supra,* 14 Del. Ch. 290, 125 Atl. 350, relied on by plaintiff, deal with factual situations where the rental provision of the entire lease in question was clearly unreasonable. Admittedly, it is improper for a trustee to make a gift of trust property unless it is advantageous to the trust estate. However, the question before us is not whether there has been a gift of the 15-acre parcel, but rather whether the parties intended to include this 15-acre parcel of land within the demised premises and if so whether the rental provision for the entire lease is reasonable.

It should be noted that factually this is not the case where a lease has been negotiated for a definite rental, followed thereafter by an agreement to include an additional parcel of land at no additional rental. The entire

negotiations were conducted for the "entire land of Kaupulehu as owned by Bishop Estate" and clearly contemplated the inclusion of the 15-acre parcel upon expiration of the existing lease to that parcel.

The general rule as to the power of trustees to make leases, when not prohibited by the trust document, is well established in the language of Professor Scott:

> "Although a trustee has power to make leases, he commits a breach of trust if he makes a lease which under all the circumstances is unreasonable. In making a lease, as in other matters relating to the administration of the trust, he is under a duty to act with prudence. If the lease is not a proper one, it can be set aside at the instance of the beneficiaries of the trust, unless the lessee is in the position of a bona fide purchaser of the interest given him under the lease."

2 Scott, *Trusts*, § 189.1 (2d ed. 1956). *In re Rosenbaum's Will*, 277 App. Div. 199, 97 N.Y.S.2d 871; *Nashville Trust Co.* v. *Cain-Sloan Co.*, 29 Tenn. App. 39, 193 S.W.2d 103.

One of the factors to be considered in determining whether there has been an abuse of discretion is "the existence or non-existence" and if present "the definiteness or indefiniteness of an external standard by which the reasonableness of the trustee's conduct can be judged." Restatement (Second), *Trusts*, § 187, comment *d; cf., Dowsett* v. *Hawaiian Trust*, 47 Haw. 577, 393 P.2d 89, *rehearing denied*, 47 Haw. 628, 393 P.2d 648. Such standard is used to test "the reasonableness of trustee's judgment." Restatement (Second), *Trusts*, § 187, comment *i;* 2 Scott, *Trusts*, § 187.2 (2d ed. 1956).

The land in question is not located in a metropolitan or otherwise developed area where external standards of the value of its prospective use are readily available. It is located in a remote and undeveloped section of the Kona

District of the Island of Hawaii. There had never been any constructive land development in the area. It had been previously leased for cattle grazing purposes operated on a haphazard basis. Plaintiff himself, in his development plan, conceived that the land's real value lay in its being developed as a combination agricultural-resort area. The classification of the 15-acre parcel as "valuable" seems to exist only in plaintiff's mind as this parcel was isolated without road access, utilities or source of potable water. The later negotiations between Hualalai and Jackson for a sublease of this parcel together with an additional 47 acres adjacent thereto at an annual rental of $500 hardly bespeaks a high value.

The success of any resort area depends entirely on the whims of the public in acceptance of the venture through patronage. Such an undertaking is, of necessity, a highly speculative venture.

The true measure of the value of this lease depends on the success of the future use of these lands. No one knows, or can know, how successful the venture will be. There is, at best, only a very indefinite external standard under such a speculative venture by which the reasonableness of a return can be measured as a basis for the rental.

At the time this lease was entered into, the parties could only estimate what the value of this leasehold interest would be. They could only make an educated guess. With this realization that a definite dollar amount could not be set on what the Bishop Estate should receive, if and when the venture proved successful, the trustees provided in the lease that the estate should receive as compensation over and above the fixed minimum rental, after the lessee had recouped his development expenses, 50% of the net sublease rentals from non-agricultural subleases and 50% of the then fair rental value of any lands improved and used by the lessee for purposes other

60

than agricultural.[9] The estate would prosper as the lessee prospered.

To insure that both the estate and the lessee would prosper, the trustees required that the lessee expend large sums of money to improve and develop the demised premises in a manner which the trustees felt would have the best chance of making the venture successful. The lessee was required to spend $20,000 for exploratory water development even before he could qualify for a lease; to spend a minimum of $58,925 within three years in pasture development and a minimum of $43,000 within two years in fencing and roads; to expend a minimum of $100,000 in developing a water system adequate for the carrying capacity of the land, and to supply the mountain cabin sites, beach lots, resort hotel sites and a small boat harbor; to pay a ranching rent, in addition to the fixed minimum rental, tied to the carrying capacity of the land and the price of beef. Finally, all rentals were subject to re-appraisal.

The amounts which the trustees required the lessee to expend in improving and developing the demised premises and the amounts the lessee was required to pay the estate for the use of the land can only be judged by an admittedly indefinite standard, *i.e.*, the reasonableness of the return as reflected by the value of this land's speculative prospective use as an agricultural-resort area. Under such a standard a court cannot substitute its judgment for that of the trustees. There is no genuine issue of material fact as to whether the defendant trustees abused their discretion in executing this lease.

The cases relied upon by plaintiff are inapplicable to

[9] This latter provision relating to sharing in the then fair rental value for non-agricultural use was not contained in the 1959 agreement nor the development plan but added during the final negotiations on the lease.

our situation as they involve clear breaches of trust. In both *Allen* v. *Hussey, supra,* 101 Cal. App. 2d 457, 225 P.2d 674, and *Griffen* v. *Ford, supra,* 1 Bosw. 123 (N.Y. Sup. Ct. 1857), the trustees were found to be without the power to make the leases in question. In *Wilmington Trust Co.* v. *Carrow, supra,* 14 Del. Ch. 290, 125 Atl. 350, the rental was obviously unreasonable, so much so as to amount to fraud and the trustee was also guilty of self-dealing with trust assets.

Plaintiff charges defendant trustees with breach of trust through "non-action," *i.e.,* the failure to exercise discretion or judgment. See Restatement (Second), *Trusts,* § 187 (1959), comment *h;* 2 Scott, *Trusts,* § 187.3 (2d ed. 1956). He argues that "upon receipt of counsel's opinion, they simply acquiesced in such opinion and ceased to exercise any judgment with regard to the [15-acre] parcel." This is the other side of the coin from that considered above. In addition to what has already been said, faced with an enforceable contract, they did exercise discretion in their judgment to live up to its terms. This may have been acquiescence but it certainly was no breach of trust.

Plaintiff further argues that "the lease as finally drafted and executed shows that Defendant-Trustees completely abdicated their responsibility with regard to the 15-acre parcel. No consideration was given to staff recommendations of November 17, 1960 and December 12, 1960." The staff recommendations referred to were those requested by the trustees at their November 10, 1960 meeting relating to development plans for the 15-acre parcel. At that time, it will be recalled, both the defendant trustees and the staff were in a state of confusion due to the misleading insistence of the plaintiff that the 15-acre parcel was not covered by the 1959 agreement. It was only at the December 15, 1960 meeting that the

trustees sought clarification through reference of the entire matter to counsel for an opinion.

In view of the binding 1959 agreement, the requested detailed development plans for the 15-acre parcel recommended by the staff on December 12, 1960, hardly seem pertinent considering the development requirements imposed on the lessee under the 1959 agreement as incorporated in the lease, as above noted. The lessee was required not only to maintain ranching activities but to promote and develop areas in the uplands for cabin sites and sites along the ocean frontage for beach homes and resort hotels. Certainly, it cannot be said that the development requirements of the lease were unreasonable and not in the best interests of the Bishop Estate.

It should be stressed that the finalized terms of the lease coincide substantially with those envisioned in plaintiff's development plan, issued before any negotiations commenced, and the negotiated terms of the 1959 agreement, and as has already been noted the rental provisions were enlarged upon to the benefit of the estate.

We have concluded that plaintiff has standing in this proceeding to restore the *status quo* through cancellation of the lease only if there is a genuine material issue of fact as to whether the defendant trustees committed a breach of trust in entering into this lease. It is our further conclusion, as indicated above, that from the amended complaint, affidavits and exhibits on file no such genuine material issue of fact has been raised.

The judgment appealed from is affirmed.

*Masaji Marumoto* (on the briefs) for plaintiff-appellant.

*J. Garner Anthony* (*Robertson, Castle & Anthony* and *Smith, Wild, Beebe & Cades* on the brief) for Trustees Estate of Bernice Pauahi Bishop, deceased, defendants-appellees.

*J. P. Russell* (on the brief) for Hualalai Development Corporation, defendant-appellee.

LEWIS, J., WITH WHOM MIZUHA, J., JOINS,
CONCURRING IN PART AND DISSENTING IN PART.

As the court holds, plaintiff must sustain his standing as one suing in a representative capacity on behalf of the beneficiaries to restore the *status quo* because of a breach of trust. As the court further holds, the allegations of breach of trust fall into two broad categories, the first relating to the trustees' decision that the 15-acre parcel was included in the contract to lease, and the second relating to the reasonableness of the terms agreed upon. I would limit plaintiff's standing as a representative of the beneficiaries to the first of these two categories. I would not recognize his standing as to the second category.

From the affidavits on file it appears that plaintiff was the principal negotiator for the trustees at a time when he held a two-year unexpired term of a lease on a 15-acre parcel that was tied in with the over-all development of beach frontage property[1] already available for development, and which, by the terms of the 1959 contract to lease which plaintiff himself negotiated, was required to be developed within the first two years of the new lease—allowing only one year after the expiration of plaintiff's lease—with a water and road system serving the beach frontage and other property, costing at least $120,000.00. Whether it was proper for the trustees to put plaintiff on the two-man negotiating committee in view of this conflict of interest need not be considered. Perhaps this conflict of interest was not noted in the beginning. In any event,

---

[1] According to a letter from the defendant trustees to the Attorney General, dated June 27, 1961, members of Bishop Estate's staff "advised that the Kahuwai Bay area [the 15-acre parcel] was the key to the beach development of Kaupulehu." Reference is made in this letter to a staff report of August 25, 1960 and a memorandum of December 12, 1960.

according to an exhibit attached to plaintiff's own affidavit, the trustees on February 8, 1961, two months before their execution of the formal lease, were informed by an affidavit of Garner Anthony, president of Hualalai, the corporation with which the contract to lease had been made: "Mr. Richards told both Mr. Sumio Nakashima, secretary of our corporation, and myself that when we were ready to start the development on the beach, he would assign to us the lease he held on the 15-acre parcel. In return for this assignment Mr. Richards stated that he would like a lot on the beach frontage with a certain period of time being rent-free."

This same affidavit also informed the trustees that even before the contract to lease was formulated "Mr. Richards and I discussed the possibilities of Kahua Ranch taking over the ranching operation involved in the project." Plaintiff had the controlling interest in Kahua Ranch, as noted in the court's opinion. This affidavit further averred that after the contract to lease, dated July 24, 1959, was entered into, "I again discussed the possibility of Kahua Ranch assuming the ranching operation involved in this project." In the early fall of 1959, according to this affidavit, plaintiff formulated a proposal the effect of which was "that if our company would assume all of the development obligations with regard to the ranching lands as set forth in the trustees' offer of July 24, 1959, then Kahua Ranch would take over the ranching operation of this project and pay the ranching rental as stipulated in the trustees' offer. Mr. Richards expressed concern over his position as trustee and stated that perhaps an independent or subsidiary corporation would have to be set up to take over the ranching operation, in effect to act as a dummy for Kahua."

The possibility that the trustees' principal negotiator

throughout the negotiations had an eye to his own profit as a rancher and as the present holder of a key 15-acre parcel of beach frontage, precludes the affirmance of the summary judgment so far as the terms of the lease are concerned. Were it not for this possibility I would agree that the action is one in which a court cannot substitute its judgment of value for that of the trustees. The value is too speculative for a case of abuse of discretion to be made out on that basis, even if the return for the 15-acre parcel be considered apart from the provisions of the lease as a whole.

However, the situation with which this court is confronted is not this. Instead, in refuting the plaintiff's claim that the 15-acre parcel was not included in the negotiations at all defendants have placed on the record unanswered accusations which preclude complete affirmance of the summary judgment.

The mere fact of participation by a cotrustee in a breach of trust does not prevent the cotrustee from bringing a suit to rectify the breach. *Tracy* v. *Central Trust Co.,* 327 Pa. 77, 192 Atl. 869; Scott, *Trusts,* § 200.2, p. 1504; Restatement, *Trusts,* § 200, comment *e* (2d ed.). But this rule is based on the assumption that a cotrustee in prosecuting the suit truly represents the beneficiaries.

As seen, plaintiff has standing only as the representative of the beneficiaries of the trust. His position therefore is analogous to that of a class representative. In a representative suit "care must be taken that persons are brought on the record fairly representing the interest or right involved, so that it may be fully and honestly tried." *Smith* v. *Swormstedt,* 16 How. (U.S.) 298, 303.

Plaintiff's whole concern in this case is to show that the 15-acre parcel never was included in the negotiations and the trustees wrongfully proceeded against the advice

of their principal negotiator, himself. Whether, under all of the circumstances, the trustees acted properly in view of the accusations of self-interest made against their principal negotiator, the plaintiff, is a question not raised by the pleadings. Had the Attorney General represented the beneficiaries, the case would not have been so restricted.[2] The question whether the defendant trustees, in view of Hualalai's knowledge of the pertinent circumstances, could have and should have taken different action in extricating themselves from the unfortunate situation in which they had been placed, requires consideration. At least, the matter should have been investigated by the Attorney General and his pleading filed, either making further averments of breach of trust going to the heart of the matter or sustaining the acts of the defendant trustees. As the record stands, I can only conclude that the beneficiaries of this charitable trust have not had fair representation as to the second portion of this case, which concerns the acts of the trustees other than their determination that the 15-acre parcel was included in the 1959 agreement and that no reformation should be sought. Plaintiff lacks that identity of interests with the beneficiaries he seeks to represent which is requisite to his standing. For plaintiff to be the one to frame the issues and himself decide how much the chancellor may consider is intolerable in view of the accusations that have come to light.

The court evidently finds these accusations relevant only to the first portion of the case. I cannot concur. In a charitable trust case, the court should enter a proper decree irrespective of the pleadings. 2 Perry, *Trusts and Trustees,* § 747, pp. 1277-78 (7th ed.). I do agree, how-

---

[2] When defendants' motions were heard and judgment granted thereon the Attorney General had not pleaded. The Attorney General named in the complaint has left office and no substitution has been effected.

ever, that there is no genuine issue as to any breach of trust by the defendant trustees in respect of their decision that the 15-acre parcel was included in the 1959 contract to lease.

I would remand for entry of a modified judgment, to consist of (1) dismissal of the action with prejudice insofar as the amended complaint avers that the defendant trustees committed a breach of trust in determining that the 15-acre parcel at Kaupulehu Beach, formerly subject to Bishop Estate Lease No. 5597, was included in the 1959 contract to lease (Exhibit A of the amended complaint) and that no reformation should be sought; and (2) dismissal of the action without prejudice in all other respects, on the ground of lack of standing of the plaintiff to represent the beneficiaries with respect thereto.